FILED IN OPEN COURT
U.S.D.C. - Atlanta

MAR 1 6 2021

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA

    *v.*

KATRINA LAWSON,
ALICIA QUARTERMAN,
TRANESHA QUARTERMAN,
NIKIA WAKEFIELD,
DARRYL WASHINGTON,
ADARIN JONES, A/K/A ADRIAN JONES,
JAMES MCFARLAND,
KATIE QUARTERMAN,
INDIA MIDDLETON, AND
VICTOR MONTGOMERY

Criminal Indictment

No. 3 21 - CR - 0 0 6

THE GRAND JURY CHARGES THAT:

### COUNT ONE
**(18 USC § 1349 – Conspiracy to Commit Wire Fraud)**

1.  Beginning on a date unknown, but from at least on or about July 1, 2020 through on or about August 30, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN,
TRANESHA QUARTERMAN,
NIKIA WAKEFIELD,
DARRYL WASHINGTON,
ADARIN JONES, a/k/a ADRIAN JONES,
JAMES MCFARLAND,
KATIE QUATERMAN,
INDIA MIDDLETON, and
VICTOR MONTGOMERY

did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other and with others known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, well knowing and having reason to know that said pretenses were and would be false and fraudulent when made and caused to made and that said omissions were and would be material, and in furtherance thereof transmitted and caused to be transmitted interstate wire communications, in violation of Title 18, United States Code, Section 1343.

MANNER AND MEANS

*A. Economic Injury Disaster Loan (EIDL)*

2.   The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law passed in March 2020 that provided $2.2 trillion dollars in emergency financial assistance to the millions of Americans who are suffering the economic effects caused by COVID-19.

3.   The provisions of the CARES Act, in conjunction with an officially declared disaster by the United States Government, allowed the Small Business Administration ("SBA") to offer Economic Injury Disaster Loan ("EIDL") funding to business owners negatively affected by COVID-19.  Through the SBA online portal, EIDL applicants could submit personal and business information in support of each EIDL application, but they did not have to submit any supporting or substantiating documentation with their application.

4.   An EIDL application included a paragraph where the applicant affirms that the information submitted is true and correct under the penalty of perjury and other applicable criminal statutes.  The application process involved filling out data fields relating to the size of the affected business entity, the ownership

2

of the business, the number of employees working for the business, and gross business revenues realized in the 12 months prior to COVID-19's impact on the national economy. The business must have existed in an operational condition on or before February 1, 2020.

5. The EIDL application information, submitted by the applicant, was then used by SBA systems to calculate the amount of money the business was eligible to receive in the form of a loan. However, in conjunction with the submission of an EIDL application, by having simply clicked on and checked a box within the on-line application, an applicant could request and then receive up to $10,000.00, an EIDL Advance, which was based upon the number of employees claimed. The EIDL Advance did not have to be repaid.

6. The SBA Office of Disaster Assistance ("ODA"), headquartered in Washington, DC, was responsible for the EIDL program. The ODA has authority over all loans created and disbursed under the EIDL program. EIDL principal proceeds and available Cash Advance Grants (up to $10,000) were solely funded by the SBA and disbursed from government-controlled accounts maintained with the U.S. Treasury at Federal Reserve Banks throughout the United States.

7. Pursuant to the provisions governing the EIDL program, loan proceeds were required to be used on certain permissible business expenses. The EIDL funds could be used by the afflicted business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid absent the impact of COVID-19.

8. As referenced above, applicants were not required to provide documents to the SBA. The SBA relied 100% on the truthfulness of an applicant's submission.

*B. The Paycheck Protection Program (PPP)*

9.  Another source of relief from the March 2020 CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for payroll, mortgage interest, rent/lease, and utilities, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized up to $310 billion in additional PPP funding.

10. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on approved expense items within a designated period of time and used a certain percentage of the PPP loan proceeds for payroll expenses.

11. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the authorized representative to acknowledge the program rules and make certain affirmative certifications in order to be eligible for the PPP loan. The application contained a box that required an electronic signature affirming that all information in the application was accurate and informing the applicant that providing false information in the application is punishable under several federal laws.

12. In the PPP loan application, the authorized representative had to state, among other things, the business's average monthly payroll expenses and number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. Unlike the EIDL, businesses applying for a PPP loan had to provide documentation

showing their payroll expenses, such as an Internal Revenue Service Form 1040 Schedule C and bank statements.

13. The SBA oversaw the PPP, but individual PPP loans were issued by private, approved lenders who received and processed PPP applications and supporting documentation. The approved lenders made the loans using the lenders' own funds, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

14. The financial institutions used by the SBA for payment of the PPP loans were numerous but included Cross River Bank through BlueVine or Kabbage. The deposits of the financial institutions used for the PPP loans were insured through the Federal Deposit Insurance Corporation ("FDIC").

   C. *Overview of Scheme to Defraud - EIDL*

15. On or about July 1, 2020, defendant Katrina LAWSON sent a series of text messages from her cell phone number to defendant Alicia QUARTERMAN outlining a scheme to fraudulently obtain the EIDL Advance (*i.e.*, the $10,000 grant). LAWSON told QUARTERMAN, "I got another money maker for us and I'll do your for free but get some people together and I'm charging $1000 per application."

16. Through additional text messages, LAWSON explained to QUARTERMAN that EIDL Advance is a "grant" that did not have to be paid back. For further details, LAWSON sent QUARTERMAN a screenshot of the SBA EIDL website. LAWSON told QUARTERMAN, "we are going to charge

$2000 for me to do the application, they will get 10,000 deposited in there account and they got to send me $2000 and I'll split it with you for every person you get." QUARTERMAN agreed to the scheme and LAWSON then told QUARTERMAN the type of information needed from each person for the EIDL application.

17. On or about July 1, 2020, QUARTERMAN provided LAWSON her information so that LAWSON could submit a fraudulent EIDL application for her. Later that same day, LAWSON submitted fraudulent EIDL applications on her own behalf and on behalf of QUARTERMAN, requesting the $10,000 advance.

18. From that point forward, QUARTERMAN contacted multiple people, including but not limited to defendants Tranesha QUARTERMAN ("T. QUARTERMAN"), Nikia WAKEFIELD, ADARIN JONES, a/k/a ADRIAN JONES, Darryl WASHINGTON, James MCFARLAND, Katie QUARTERMAN ("K. QUARTERMAN"), and India MIDDLETON, mostly via text message from her cell phone, and told them about the EIDL scheme, her "fee," and the needed personal information for the loan.

19. QUARTERMAN also told several of these individuals that they could recruit their friends or family to participate in the scheme. For example, defendant Victor MONTGOMERY was recruited by WAKEFIELD. In total, T. QUARTERMAN recruited at least four individuals, WAKEFIELD recruited at least three individuals, WASHINGTON recruited at least two individuals, and JONES, MCFARLAND, and K. QUARTERMAN each recruited at least one individual.

20. T. QUARTERMAN, WAKEFIELD, JONES, WASHINGTON, MCFARLAND, K. QUARTERMAN, MIDDLETON, and others sent their personal information via text message to QUARTERMAN who forwarded the information to LAWSON also via text message. LAWSON then reviewed the information and contacted QUARTERMAN if more information was needed.

21. Once LAWSON had all the required information, LAWSON completed the online EIDL applications by inputting false information for each applicant, including the existence of a business, how many employees worked for the business, and the income for the business. LAWSON then submitted the applications to the SBA.

22. After submitting the fraudulent applications, LAWSON took a screenshot of the EIDL application number and sent it via text message to QUARTERMAN. QUARTERMAN then in turn sent the screenshot via text message to the co-conspirators, including but not limited to T. QUARTERMAN, WAKEFIELD, JONES, WASHINGTON, MCFARLAND, K. QUARTERMAN, and MIDDLETON.

23. As the other individuals waited for their applications to be processed, QUARTERMAN frequently checked-in with them to verify whether or not the $10,000 EIDL Advance was deposited into their bank accounts. Once they received the money, to finalize the scheme, the other defendants paid QUARTERMAN her "fee" from the EIDL Advance proceeds by cash, bank cashier's check, or mobile banking applications (like CashAPP, ApplePay, and Zelle). Once QUARTERMAN received her "fee," she and LAWSON divided up the money between each other, mostly by electronic banking means.

24. Overall, between July 1, 2020 and August 1, 2020, QUARTERMAN sent LAWSON the information for at least 48 different individuals for the purpose of submitting the fraudulent EIDL applications. LAWSON, using this information, completed approximately 58 fraudulent EIDL applications (because some applications were denied and LAWSON re-submitted an additional application for the same person). All of these applications contained false information in order to qualify for the funds. The SBA accepted and paid out at least $185,500 on 19 EIDL applications submitted by LAWSON on information given to her by QUARTERMAN. The total amount sought through EIDL was at least $560,000.

*D. Overview of Scheme to Defraud – PPP*

25. As of at least July 14, 2020, LAWSON and QUARTERMAN began to consider expanding their scheme to include the PPP loans. On or about July 27, 2020, LAWSON sent QUARTERMAN a text message that said,

> "You can get up to 20,000 with the Paycheck protection Program. The Loans are 100% forgivable if you follow the PPP loan forgiveness requirements issued by the Small Business Administration (SBA). I will take care of the loan forgiveness document as well so you don't have to worry about that. The fee to do the loan is $6000, so you end up with $14000. The time frame use to be 3-4 business days but right now it's no set time for funds to be deposited into your account, but you will get it give or take 7-10 days. I will need to your February bank statement in order to proceed."

LAWSON intended to fill out the appropriate paperwork falsely so that the PPP loans would not have to be paid back.

26. After working out the details of the expanded scheme with LAWSON, QUARTERMAN contacted many of the same individuals that she originally contacted for the EIDL scheme and told them about the PPP loan and the new information needed to apply. QUARTERMAN informed them of the new fee structure, including charging up to $10,000 for her share of the PPP loan because

of the additional paperwork that had to be created.  For example, in order to apply for a PPP loan, since the applications were all fraudulent, LAWSON and QUARTERMAN had to create fraudulent Internal Revenue Service Forms 1040 Schedule C to show that the "businesses" of the co-conspirators made certain amounts.  The PPP application was also longer than the EIDL application.

27. In total, QUARTERMAN sent the information for 15 individuals to LAWSON via text message, including but not limited to the information for herself, WAKEFIELD, MIDDLETON, and MONTGOMERY, for the purposes of submitting fraudulent PPP loans to the SBA.  LAWSON completed the online applications and submitted the loan applications, directly or indirectly, via the internet to the financial institutions who then electronically sent them to the SBA. She then notified QUARTERMAN via text message that the PPP loan applications were complete and tracked them to determine if and when they were approved.  LAWSON also applied for a fraudulent PPP loan in her own name.

28. Once the PPP loan money was received, to finalize the scheme, the other individuals, including but not limited to WAKEFIELD and MONTGOMERY, paid QUARTERMAN her "fee" from the PPP proceeds in cash, bank cashier's check, or mobile banking applications (like CashAPP, ApplePay, and Zelle). MONTGOMERY, who again was recruited by WAKEFIELD, paid QUARTERMAN by mailing a $10,000 check to her through the United States Postal Service on or about August 3, 2020.

29. Just as with the EIDL funds, once QUARTERMAN received the "fee" for the fraudulent PPP loans, she and LAWSON divided up the money using electronic banking methods.

30. In total, the SBA partner banks initially approved 11 of the fraudulent PPP loans submitted by LAWSON using information sent to her by QUARTERMAN. These financial institutions paid out at least $124,276 on six of the loans, as the additional five PPP loan applications were ultimately denied.  The total amount sought for all of the PPP applications submitted by LAWSON was at least $224,172.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### (18 USC § 1343 – Wire Fraud)

31. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

32. On or about July 7, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,<br>
ALICIA QUARTERMAN, and<br>
TRANESHA QUARTERMAN,

aided and abetted by one another, did knowingly devise and intend to devise the aforementioned scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and transmitted and caused to be transmitted an interstate wire communication, to wit, a cellular telephone text message from QUARTERMAN to LAWSON with the personal and banking

information of T. QUARTERMAN for submission of a fraudulent EIDL application, in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT THREE
### (18 USC § 1343 – Wire Fraud)

33. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

34. On or about July 1, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN, and
NIKIA WAKEFIELD,

aided and abetted by each other, did knowingly devise and intend to devise the aforementioned scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and transmitted and caused to be transmitted an interstate wire communication, to wit, a cellular telephone text message from QUARTERMAN to LAWSON with the personal and banking information of WAKEFIELD for submission of a fraudulent EIDL application, in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT FOUR
### (18 USC § 1343 – Wire Fraud)

35. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

36. On or about July 1, 2020, in the Northern District of Georgia and elsewhere, the defendants,

11

KATRINA LAWSON,
ALICIA QUARTERMAN, and
DARRYL WASHINGTON,

aided and abetted by one another, did knowingly devise and intend to devise the aforementioned scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and transmitted and caused to be transmitted an interstate wire communication, to wit, a cellular telephone text message from QUARTERMAN to LAWSON with the personal and banking information of WASHINGTON for submission of a fraudulent EIDL application, in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT FIVE
### (18 USC § 1343 – Wire Fraud)

37. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

38. On or about July 1, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN, and
ADARIN JONES, a/k/a ADRIAN JONES,

aided and abetted by one another, did knowingly devise and intend to devise the aforementioned scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and transmitted and caused to be transmitted an interstate wire communication, to wit, a cellular telephone text message from QUARTERMAN to LAWSON with the personal and banking

information of JONES, for submission of a fraudulent EIDL application, in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT SIX
### (18 USC § 1343 – Wire Fraud)

39. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

40. On or about July 7, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN, and
JAMES MCFARLAND,

aided and abetted by one another, did knowingly devise and intend to devise the aforementioned scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and transmitted and caused to be transmitted an interstate wire communication, to wit, a cellular telephone text message from QUARTERMAN to LAWSON with the personal and banking information of MCFARLAND for submission of a fraudulent EIDL application, in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT SEVEN
### (18 USC § 1343 – Wire Fraud)

41. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

42. On or about July 1, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,

ALICIA QUARTERMAN, and
KATIE QUARTERMAN,

aided and abetted by one another, did knowingly devise and intend to devise the aforementioned scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and transmitted and caused to be transmitted an interstate wire communication, to wit, a cellular telephone text message on from QUARTERMAN to LAWSON with the personal and banking information of K. QUARTERMAN for submission of a fraudulent EIDL application, in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT EIGHT
### (18 USC § 1343 – Wire Fraud)

43. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

44. On or about July 2, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN, and
INDIA MIDDLETON,

aided and abetted by one another, did knowingly devise and intend to devise the aforementioned scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and transmitted and caused to be transmitted an interstate wire communication, to wit, a cellular telephone text message from QUARTERMAN to LAWSON with the personal and banking

information of MIDDLETON for submission of a fraudulent EIDL application, in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT NINE
### (18 USC § 1343 – Wire Fraud)

45. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

46. On or about July 27, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN, and
INDIA MIDDLETON,

aided and abetted by one another, did knowingly devise and intend to devise the aforementioned scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and transmitted and caused to be transmitted an interstate wire communication, to wit, a cellular telephone text message from QUARTERMAN to LAWSON with photos of the front and back of MIDDLETON's Maryland driver's license for the purposes of submitting a fraudulent PPP application, in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT TEN
### (18 USC § 1344 – Bank Fraud)

47. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

48. On or about July 30, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN,
NIKIA WAKEFIELD, and
VICTOR MONTGOMERY,

aided and abetted by each other, with intent to defraud, did knowingly devise and intend to devise a scheme and artifice (i) to defraud Cross River Bank, a financial institution the deposits of which were then insured by the FDIC, and (ii) to obtain moneys, funds, and assets owned by and under the custody and control of Cross River Bank, a financial institution the accounts of which were insured by the FDIC, by means of materially false and fraudulent pretenses, representations, and promises, to wit, by certifying that all information in the PPP loan application for MONTGOMERY was accurate when it contained the following false information:

- a fraudulent Internal Revenue Service Form 1040 Schedule C,
- an assertion that MONTGOMERY was a sole proprietor owning 100% of the business,
- the amount of MONTGOMERY's average monthly payroll, and
- an assertion that the purpose of the loan was for payroll, lease/mortgage interest, and utilities.

All in violation of Title 18, United States Code, Section 1344 and Section 2.


**COUNT ELEVEN**
**(18 USC § 1344 – Bank Fraud)**

49. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

50. On or about July 30, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,

16

ALICIA QUARTERMAN, and
TRANESHA QUARTERMAN,

aided and abetted by each other, with intent to defraud, did knowingly devise and intend to devise a scheme and artifice (i) to defraud Cross River Bank, a financial institution the deposits of which were then insured by the FDIC, and (ii) to obtain moneys, funds, and assets owned by and under the custody and control of Cross River Bank, a financial institution the accounts of which were insured by the FDIC, by means of materially false and fraudulent pretenses, representations, and promises, to wit, by certifying that all information in the PPP loan application for an individual with the initials A.D was accurate when it contained the following false information:

- a fraudulent Internal Revenue Service Form 1040 Schedule C,
- an assertion that A.D. was a sole proprietor owning 100% of the business,
- the amount of A.D.'s average monthly payroll, and
- an assertion that the purpose of the loan was for payroll, lease/mortgage interest, and utilities.

All in violation of Title 18, United States Code, Section 1344 and Section 2.

## COUNT TWELVE
### (18 USC § 1341 – Mail Fraud)

51. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

52. On or about August 3, 2020, in the Northern District of Georgia and elsewhere, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN,

17

TRANESHA QUARTERMAN, and,
VICTOR MONTGOMERY,

aided and abetted by each other, did knowingly devise and participate in a scheme and artifice to defraud to obtain money and property  by means of materially false and fraudulent pretenses, representations, and promises,  as well as by an omission of material fact, knowing and having reason to know that the pretense, representation, promise, and omission was and would be material, and did knowingly place and cause to be placed in an authorized depository for mail matter to be sent and delivered by the United States Postal Service, to wit, United States Postal Service Express Mail piece #EJ207659169US, in violation of Title 18, United States Code, Section 1341 and Section 2.

### **COUNT THIRTEEN**
**(18 USC § 1957 – Money Laundering)**

53. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

54. On or about August 3, 2020, in the Northern District of Georgia and elsewhere, the defendant,

KATRINA LAWSON,

did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, to wit, purchasing a white 2019 Mercedes Benz GLE 43 AMG, such property having been derived from a specified unlawful activity, that is, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, as charged in Count One of this Indictment, all in violation of Title 18, United States Code, Section 1957.

## COUNT FOURTEEN
### (18 USC § 1957 – Money Laundering)

55. The factual allegations in paragraphs two through thirty above are incorporated herein by reference.

56. On or about September 23, 2020, in the Northern District of Georgia and elsewhere, the defendant,

ALICIA QUARTERMAN,

did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, to wit, purchasing a black 2018 CAN-AM Maverick side by side ATV, such property having been derived from a specified unlawful activity, that is, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, as charged in Count One of this Indictment, all in violation of Title 18, United States Code, Sections 1957.

## FORFEITURE PROVISION

57. Upon conviction of one or more of the offenses alleged in Counts One through Fourteen, the defendants,

KATRINA LAWSON,
ALICIA QUARTERMAN,
TRANESHA QUARTERMAN,
NIKIA WAKEFIELD,
ADRIAN JONES,
DARRYL WASHINGTON,
JAMES MCFARLAND,
KATIE QUARTERMAN,

19

INDIA MIDDLETON, and
VICTOR MONTGOMERY

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any property, real or personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of such violation(s), including but not limited to the following:

a. MONEY JUDGMENT:    A sum of money in United States currency representing the amount of proceeds obtained as a result of each offense, or conspiracy to commit such offense, for which the defendant is convicted.

58.  If, as a result of any act or omission of the defendant, any property subject to forfeiture:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek

20

forfeiture of any other property of the defendant up to the value of the forfeitable property.

A _____ *TRUE* _____ BILL

_____
FOREPERSON

KURT R. ERSKINE
*Acting United States Attorney*

MIGUEL R. ACOSTA
*Assistant United States Attorney*
Georgia Bar No. 910787
600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181